IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| LAWRENCE S., | ) | |
|     Plaintiff, | ) | Civil Action No. 5:17-cv-00096 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Social Security Administration, | ) | By:   Joel C. Hoppe |
|     Defendant. | ) | United States Magistrate Judge |

Plaintiff Lawrence S.[1] ("Lawrence") asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by the parties' consent under 28 U.S.C. § 636(c). ECF No. 7. Having considered the administrative record, the parties' briefs, and the applicable law, I cannot find that substantial evidence supports the Commissioner's final decision. Accordingly, the decision will be reversed and the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials. I am adopting this practice for any publicly available document that I issue in these cases.

1

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See*

*Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4).[2] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In August 2013, Lawrence filed for DIB alleging that he was disabled by fibromyalgia; rotator cuff syndrome; lumbar myofascial, spondylosis, herniation and annular tear; traumatic brain injury and post-concussion syndrome; diabetes, heart disease, and hypertension; sleep apnea; bipolar disorder; and attention deficit disorder. *See* Administrative Record ("R.") 75, 176–77, ECF No. 9. Lawrence was fifty-three years old, or a "person closely approaching advanced age" under the regulations, when he allegedly became disabled in September 2011. R. 75; 20 C.F.R. § 404.1563(d). Disability Determination Services ("DDS"), the state agency, denied his claim initially in March 2014, R. 74–85, and upon reconsideration that December, R. 86–101. On June 7, 2016, Lawrence appeared with counsel and testified at an administrative hearing before ALJ William Hauser. *See* R. 45–72. A vocational expert ("VE") also testified at this hearing. R. 66–72.

ALJ Hauser issued an unfavorable decision on August 3, 2016. R. 24–36. He first found that Lawrence had not worked since he allegedly became disabled on September 23, 2011, and that he met the Act's insured-status requirements through December 31, 2013.[3] R. 25. At step two, ALJ Hauser found that, as of his DLI, Lawrence had severe medical impairments including

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[3] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). To qualify for DIB, Lawrence had to "prove that [he] became disabled prior to the expiration of [his] insured status." *Johnson*, 434 F.3d at 656.

3

degenerative disc disease, degenerative joint disease rotator cuff repair, lumbar spine tumor, anxiety disorders, bipolar disorder, attention deficit hyperactivity disorder, brain injury/post-concussion syndrome, obesity, and coronary artery disease with stent placement. *Id.* The ALJ found the following impairments to be non-severe: hypertension, diabetes, hyperlipidemia, hypogonadism, vitamin D deficiency, fibromyalgia, chronic pain syndrome, bilateral carpal tunnel syndrome, obstructive sleep apnea, symptomatic venous insufficiency conditions, gastrointestinal conditions, and Lyme's disease. R. 25–27. None of Lawrence's severe impairments met or equaled a listing at step three. R. 27–29.

ALJ Hauser then evaluated Lawrence's functional capacity ("RFC") and found that during the relevant period he could have performed less than a full range of medium, unskilled work as defined in the regulations. *See* R. 29 (citing 20 C.F.R. § 404.1567(c)). More specifically, Lawrence could "lift 25 lbs. frequently and 50 lbs. occasionally"; sit and stand for six hours during an eight-hour work day; and occasionally crouch, crawl, kneel, stoop, climb, and reach overhead with either arm. *Id.* He could perform "simple, routine tasks [involving] occasional interaction with peers, public, and supervisors, but he "would be off task 10% of the time, miss 10 days of work a year, and need 10 minutes of rest every 2 hours." *Id.* Based on this RFC finding and the VE's testimony, ALJ Hauser concluded at step five that Lawrence was not disabled between September 23, 2011, and December 31, 2013, because he still could have performed certain unskilled occupations that offered a significant number of jobs in the national economy, such as mold filler, hand packager, or box bender. R. 35–36. The Appeals Council declined to review the ALJ's decision, R. 1–5, and this appeal followed.

III. Discussion

On appeal, Lawrence challenges the ALJ's RFC determination. He argues that the ALJ erred in giving greater weight to the opinions of the state agency physicians over the opinion of his treating physician, Laura Stone, M.D. He also asserts that the RFC does not fully account for his difficulties standing, lifting, reaching, and handling stress. *See* Pl.'s Br. 14–25, ECF No. 14.

*A.    Medical Evidence*

On November 2, 2011, Lillian Somner, D.O., a psychiatrist, evaluated Lawrence for depression, anger, and attention deficit disorder. R. 287–304. Lawrence reported having pain for as long as he could remember, and he experienced instances of uncontrollable anger and situational depression. R. 287–88. He had sustained numerous head injuries, and he had trouble concentrating. R. 290–91. Dr. Somner conducted various tests as well as a brain scan, which was negative. *See* R. 595. She diagnosed bipolar disorder and attention deficit hyperactivity disorder. R. 301. Dr. Somner prescribed Lamictal and Adderall. R. 303.

In December 2011, Lawrence was admitted to the hospital for a few days after experiencing periods of confusion and inability to speak as well as thoughts of suicide. R. 592–94. Lawrence reported having problems from taking Lamictal, which Dr. Somner had recently prescribed. His medication was switched to Clonazepam. R. 596.

On May 15, 2012, Lawrence visited Neil Chatterjee, M.D., at the Virginia Spine Institute. R. 328–31. Lawrence reported chronic whole body pain for more than ten years that he attributed to a motorcycle accident, power lifting, construction work, and fighting. *See* R. 328. He said he took up to five Percocet tablets a day, but received no relief and was unable to return to regular activities. He did not report medication side effects. On examination Dr. Chatterjee found that Lawrence had a normal gait, appropriate mood and affect, spine tenderness, normal straight leg raising tests, intact strength and sensation in his extremities, right upper extremity tremor, and

5

positive signs for carpal tunnel syndrome ("CTS"). Dr. Chatterjee deemed it necessary to get more information to assess Lawrence's chronic pain, but for the meantime he prescribed Dilaudid of up to six doses a day. At a follow-up visit on June 5, Lawrence reported no pain relief from the medication. R. 332–33. He was still lifting heavy weights though. Exam findings were the same, and Dr. Chatterjee switched Lawrence's pain medication prescription from Dilaudid to Roxicodone.

On July 17, Lawrence saw Brian R. Subach, M.D., at the Virginia Spine Institute, also for chronic pain. E. 340–41. Dr. Subach's exam findings were normal. He also reviewed a cervical MRI that showed mild abnormalities. He noted some spinal cord signal changes, possible signs of myelopathy, and an old MRI showing decreased disc height at L5-S1. He determined that surgery was not warranted, and he ordered a lumbar spine MRI to assess the underlying pathology. The MRI showed 75% disc height loss and significant narrowing at L5-S1. R. 339.

On September 21, Dr. Chatterjee performed an electroneuromyographic (EMG") evaluation, which showed no lower extremity radiculopathy or peripheral neuropathy. R. 350–54. A physical examination of Lawrence's lower extremities produced normal findings.

At an appointment on November 29, Lawrence told Dr. Chatterjee that he was still competing in power lifting. R. 346–48. Exam findings were normal, but Lawrence reported that medications did not control his pain. Dr. Chatterjee prescribed Oxycontin as well as Roxicodone.

An MRI taken on August 31, 2012, of Lawrence's right shoulder revealed mild tendinopathy and labral tear, but no rotator cuff tear. R. 439–40. On September 11, Lawrence visited Frank A. Pettrone, M.D., who had operated on his left shoulder in 2010. R. 436. Lawrence said he had been able to return to power lifting after that surgery, but he had recently strained his shoulder. On examination, Dr. Pettrone found some impingement, but good stability

6

and motion. He injected Lawrence's shoulder with Xylocaine and discussed decompression surgery. On November 1, Lawrence had shoulder and CTS release surgery. R. 454. At post-operation examinations in November, Dr. Pettrone noted that Lawrence was progressing well, and he released him to full activities and shoulder rehabilitation therapy. *See* R. 430–32. On January 2, 2013, Dr. Pettrone found good shoulder motion, stability, and strength, but noted that Lawrence had other problems caused by fibromyalgia and leg and back pain for which he was prescribed fentanyl patches and Oxycontin. R. 429. On March 21, Lawrence told Dr. Pettrone that two months earlier he had twisted and strained his shoulder while trying to restrain his daughter from fighting his wife. R. 428. As a result, he had been in pain and had difficulty lifting and reaching. On examination, he had good strength and motion, but impingement pain. Dr. Pettrone ordered an MRI, which showed more tendinosis, significant partial tearing of the supraspinatus, and early arthritis. R. 427. On July 18, 2013, Lawrence again had good strength and motion, but positive impingement. Lawrence said he could not lift or use his arm, but he wanted to be able to return to power lifting. Dr. Pettrone expressed concern over Lawrence's use of 120mg of Oxycontin a day and explained that he would not operate on Lawrence's shoulder again until he stopped taking it.

Lawrence made regular visits every two to three months to Winchester Family Health, including throughout the relevant period of September 2011 to December 2013. *See generally* R. 684–745. At most visits, he told Hugh LaBree, FNP, that he had pain in his joints, legs, and back, but LaBree's findings on physical and mental examination were mostly normal. *See, e.g.*, R. 692–93, 698, 703, 710–11, 733, 737.

In 2012 through 2013, Lawrence also visited the National Spine & Pain Center about once a month, and he was primarily treated by Maria Paz S. Babcock, D.O. He had been referred

7

there for treatment for fibromyalgia and generalized pain. On October 4, 2012, Lawrence complained of chronic pain aggravated by sitting, standing, walking, and lying flat. R. 830. He had tried pain medications, physical therapy, injections, and chiropractic treatment, but they did not alleviate his pain. Physical and mental examination findings were normal, except that he had diffuse tenderness in the upper and lower extremities as well as the cervical and lumbar regions. R. 832. The examining doctor noted, "[t]rue weakness difficult to assess due to pain and tenderness on examination, and patient's overall feeling of weakness." *Id.* (punctuation corrected). Over the course of Lawrence's treatment at the National Spine & Pain Center, Dr. Babcock at times found no abnormalities on physical and mental examination. *See* R. 796–99, 807–10, 824–26, 827–29. On other visits, she noted abnormal findings on lumbar spine examinations, including positive straight leg raising tests. R. 782–86, 787–91, 792–95, 800–03, 815–19. Dr. Babcock prescribed Oxycodone and at times Fentanyl patches and Dilaudid, and she administered Lidocaine injections.

B.      *Lawrence's Statements*

In written statements submitted to the state agency, Lawrence described his typical activities. R. 213–14, 225–32 (Jan. 29, 2014). When he was doing well, Lawrence helped his wife clean the house, cook meals, and take care of their adult daughter with special-needs. R. 225–26. He cooked simple meals weekly or daily for fifteen minutes to two hours, but standing caused significant pain, taking hours or days to recover, and he cooked less frequently than in the past. *See* R. 227. He sometimes fell asleep while driving or trying to do other activities. R. 213; *see also* R. 705 ("Pt. reports increased fatigue to the point that he has a hard time staying awake while driving." (Apr. 4, 2013)). Depending on how he felt, he could watch television and "build[] & design[] things." R. 229. Lawrence shopped in stores for food once a week for thirty

to sixty minutes. He had been a competitive power lifter, but he had stopped after he reinjured his shoulder in late 2012. *See* R. 63–65, 229–30. Lawrence had been dealing with severe pain for many years, "pushing through it," R. 213, 232 (grammar corrected), but by 2011 or 2012 the pain on many, but not all, days significantly limited his activities and affected his concentration.

C.     Analysis

A claimant's RFC represents his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite his medical impairments. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted); *see* 20 C.F.R. § 404.1545. It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined functionally limiting effects of impairments that are supported by the medical evidence or the claimant's credible reports of pain or other symptoms, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). Conversely, the RFC finding need not reflect any restriction that the ALJ reasonably concluded "was not a credibly established limitation" related to the claimant's medical impairments. *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016). "This RFC assessment is a holistic and fact-specific evaluation," *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017), which must reasonably account for any functional limitations the ALJ identified at steps two or three of her decision, *see Mascio*, 780 F.3d at 638–39; *Ashcraft v. Colvin*, No. 3:13cv417, 2015 WL 9304561, at *8–10 (W.D.N.C. Dec. 21, 2015). The ALJ's written decision also must "include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in the RFC assessment, *Mascio*, 780 F.3d at 636, and explaining why he

discounted any "obviously probative" evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977), that supported the individual's claim for disability benefits, *Ezzell v. Berryhill*, 688 F. App'x 199, 200 (4th Cir. 2017).

In explaining his RFC determination, the ALJ questioned the severity of Lawrence's report of symptoms.[4] He noted that the medical record showed generally normal mental and physical examinations and limited, conservative treatment. R. 33. This analysis, which consisted of only five sentences, was perfunctory and incomplete:

> The claimant's subjective complaints are not fully supported by the objective medical evidence. . . . The nature of the claimant's medical care and his admitted activities of daily living and functional capacities[] serve to diminish its consistency with the record regarding the frequency and severity of his symptoms and the extent of his functional limitations. Specifically, the claimant had generally normal mental and physical examinations, underwent limited and conservative treatment, and the record demonstrated he was lifting heavy weights during the requisite period. These factors are consistent with the claimant engaging in less than a full range of medium work.

R. 32–33. In reciting the medical evidence, the ALJ did adequately discuss the various providers' clinical findings, and other than consistent findings of lumbar spine abnormalities, many examinations did show mostly normal findings. In his analysis, however, the ALJ did not cite a single medical record in support of his conclusion that the examination findings were "generally

---

[4] The regulations set out a two-step process for ALJs to evaluate symptoms as part of the RFC assessment. *See Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [his] ability," *id.*, to work on a regular and continuing basis, *Mascio*, 780 F.3d at 637. "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects" after considering all the relevant evidence in the record. *Lewis*, 858 F.3d at 866; *see Mascio*, 780 F.3d at 639; *Hines*, 453 F.3d at 565. The ALJ must give specific reasons supported by "references to the evidence" for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013), and, when necessary, he should "explain how he decided which of [those] statements to believe and which to discredit," *Mascio*, 780 F.3d at 640. A reviewing court will uphold the ALJ's credibility determination if his articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

normal." *Cf. Monroe*, 826 F.3d at 191 (the ALJ's failure to "specify what 'objective evidence' or what aspects of Monroe's 'treatment history' he was referring to" when weighing various medical opinions precluded meaningful judicial review). The ALJ also failed to explain how the consistently abnormal findings on lumbar exams factored into his conclusion that Lawrence "could actually perform the tasks required by 'medium work,' such as lifting up to 50 pounds at a time, frequently lifting or carrying up to 25 pounds, or standing or walking for six hours." *Woods*, 888 F.3d at 694 (ALJ's failure "to build an accurate and logical bridge from the evidence he recounted to his conclusion about Woods's residual function capacity" warranted remand).

Moreover, the only treatment the ALJ discussed in reciting the overall evidence—he did not identify in his RFC analysis what treatment he deemed conservative—was not actually conservative. The ALJ noted that Lawrence underwent shoulder and CTS surgery in November 2012. R. 33. To be sure, those were the only surgeries that Lawrence had during the relevant period. Yet, the ALJ did not even mention that as Lawrence's shoulder symptoms worsened following his November 2012 surgery, Dr. Pettrone considered another surgery necessary, but would not perform it until Lawrence reduced the amount of narcotic pain medications he was taking. The ALJ simply did not discuss any other treatment that Lawrence received for his many severe impairments, nor did he identify what treatment he found to be conservative. And, although medications are typically viewed as conservative treatment, using combinations of serious narcotic pain medications, such as Oxycontin, Fentanyl, and Dilaudid, could support Lawrence's claims of experiencing severe pain. *See Lewis*, 858 F.3d at 869. In this situation, the ALJ needed to discuss the *specific* evidence that he found to support his conclusion that Lawrence's treatment raised credible doubts about his report of pain and other symptoms. *See Dunn v. Colvin*, 607 F. App'x 264, 274–75 (4th Cir. 2015); *Adams v. Colvin*, No. 6:14cv460,

11

2015 WL 4660873, at *5 (D.S.C. Aug. 5, 2015) ("An ALJ evaluating a claimant's subjective complaints 'should refer specifically to the evidence informing the ALJ's conclusion.'" (quoting *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989))).

Lastly, the ALJ noted that Lawrence "was lifting heavy weights during the requisite period." *Id.* This observation is accurate, but tells only part of the story. Lawrence was a competitive weightlifter, as he told his treatment providers. In the months after his shoulder surgery, Lawrence's shoulder again became symptomatic. He told Dr. Pettrone that he injured it trying to restrain his daughter. His statements to Dr. Pettrone, like his written statements to the state agency, showed that his shoulder problems caused difficulty with lifting and reaching, and he was unable to lift weights beginning in late 2012 or early 2013. In later treatment notes, Lawrence expressed an interest in returning to weight lifting, which suggests he was then not able to do it, but he never indicated he regained that ability. *See Woods*, 888 F.3d at 694 ("An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which [he or] she can perform them."). Thus, each factor identified in the ALJ's credibility analysis does not withstand scrutiny when compared to the relevant evidence as a whole.

After discussing Lawrence's report of symptoms, the ALJ then discussed the medical opinions. R. 33–34. Lawrence primarily challenges ALJ Hauser's decision to credit the DDS physicians' opinions over Dr. Stone's medical opinions about his exertional capacities. *See* Pl.'s Br. 14–23. Medical opinions are statements from "acceptable medical sources," such as physicians, that reflect the source's judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. § 404.1527(a)(1). The ALJ must adequately explain the weight

afforded to each medical opinion in the claimant's record, taking into account relevant factors such as the nature and extent of the physician's treatment relationship with the claimant; how well the physician explained or supported the opinion; the opinion's consistency with the record as a whole; and whether the opinion pertains to the physician's area of specialty.[5] *Id.* § 404.1527(c). A reviewing court "must defer to the ALJ's assignments of weight" among conflicting medical opinions unless the ALJ's underlying findings or rationale "are not supported by substantial evidence" in the record. *Dunn*, 607 F. App'x at 271 (citing *Hancock*, 667 F.3d at 472); *see also Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016).

On May 24, 2016, Dr. Stone completed a physical functional assessment form. R. 1504–05. She opined that Lawrence could sit and stand or walk for at most one hour in an eight-hour workday, he could walk less than one city block, he was "unable" to lift and carry any weight in a competitive work setting, and he would need to lie down during the workday. Dr. Stone noted symptoms of severe fatigue and pain that she attributed to encephalopathy and selective immunoglobulin deficiency. Additionally, Lawrence's symptoms would constantly interfere with his ability to pay attention and concentrate. He got very confused and "can't think," and he was unable to work. *Id.*

---

[5] Lawrence's argument invokes aspects of the "treating physician rule," *see* Pl.'s Br. 14–23, which sets out a special standard for ALJs to evaluate medical opinions from physicians who, by virtue of an established "treatment relationship" with the claimant, are "likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the claimant's impairments, 20 C.F.R. § 404.1527(a)(2). A treating physician's medical opinion is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. § 404.1527(c)(2). If the ALJ does not give a treating physician's medical opinion controlling weight, then he must consider the five regulatory factors "to determine what lesser weight should instead be accorded the opinion." *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 256 (4th Cir. 2017). The ALJ "will always give good reasons" for the weight assigned to these opinions. 20 C.F.R. § 404.1527(c)(2). Although treating physicians' medical opinions deserve deference, the ALJ may discount or reject such an opinion when he relies on "persuasive contrary evidence" in the record. *Mastro*, 270 F.3d at 178; *see Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014); *Hines*, 453 F.3d at 563 n.2.

The ALJ gave "little weight" to Dr. Stone's opinion because it was inconsistent with other evidence in the record, specifically the DDS physicians' opinions and Lawrence's reported activities of preparing meals and driving a car when traveling. R. 33. These reasons are insufficient. A conflict between a treating physician's opinion and the opinions of DDS physicians does not provide an adequate basis alone to reject the treating physician's opinion. *See Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013); 20 C.F.R. § 404.1527(c)(2). An ALJ must delve into the administrative record to explain why the medical and other evidence supports one medical opinion over another. Here, the ALJ simply did not perform that analysis. Additionally, the ALJ's discussion of two of Lawrence's activities—cooking and driving—was deficient. Lawrence stated that he performed certain activities, such as driving and cooking, when he was able to and not in debilitating pain. The ALJ "did not acknowledge the limited extent of those activities as described by [Lawrence] or explain how those activities showed that he could sustain a full-time job." *Brown*, 873 F.3d at 269. Although these minimal activities arguably show greater functional capacity than Dr. Stone's opinion would suggest, they still show very limited capabilities and, thus, offer little support for the ALJ's analysis.

Nevertheless, the ALJ's inadequate analysis of Dr. Stone's opinion is harmless error. No medical evidence in the record for the relevant period of Lawrence's application (September 2011 through December 2013) supports Dr. Stone's extreme limitations, such as an inability to sit for more than one hour or to lift any weight. Moreover, Dr. Stone did not even begin treating Lawrence until twenty months after his date last insured, *see* R. 1445–49, 1453, 1462–79, and her medical opinion, which is dated two-and-a-half years after the date last insured, does not address Lawrence's limitations during the relevant period. Thus, although the ALJ's analysis is flawed, his error is harmless because Dr. Stone's opinion would not have any impact on the

outcome of this case. That said, the ALJ's flawed analysis nonetheless further undermines his RFC determination.

The ALJ gave "significant weight" to the DDS opinions of Lawrence's physical and mental functional abilities because they were consistent with evidence that Lawrence lifted heavy weights, walked when traveling, and had no problems with personal care. The ALJ also noted, without any elaboration, that evidence received after the DDS review showed additional mental limitations. An ALJ may credit a medical opinion from a non-examining physician where the source adequately explains the opinion and it is consistent with the record as a whole. *See Woods*, 888 F.3d at 697; 20 C.F.R. § 404.1527(c)(3)–(4). The ALJ's reasons for assigning their opinions great weight, however, simply do not withstand scrutiny. As discussed above, the ALJ's reliance on Lawrence's report of activities is flawed because he did not account for the limited and inconsistent extent Lawrence said he could perform them. Moreover, his ability to manage his personal care, i.e., dressing, bathing, caring for his hair, shaving, and feeding himself, provides little if any support for the ALJ's decision to credit the DDS physicians' opinions that Lawrence could perform sustained work at the "medium" exertion level.

"A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford*, 734 F.3d at 295 (internal citation omitted). The ALJ does not need to discuss every piece of relevant evidence, but she "must evaluate the record fairly," *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (per curiam), and provide enough "analysis of the evidence to allow the [reviewing] court to trace the path of his [or her] reasoning," *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). *See Lewis*, 858 F.3d at 869; *Mascio*, 780 F.3d at 636–

15

38; *Hines*, 453 F.3d at 566 (citing *Diaz*, 55 F.3d at 307). Similarly, it is not enough for the ALJ to simply summarize the relevant evidence if he then fails to explain how he resolved material ambiguities or conflicts in the record and why the credited evidence supports his findings and conclusions. *See Thomas v. Berryhill*, 916 F.3d 307, 310–13 (4th Cir. 2019); *Woods*, 888 F.3d at 695; *Monroe*, 826 F.3d at 191. In other words, the "ALJ's failure to 'build an accurate and logical bridge from the evidence to his conclusion'" that the claimant is not disabled typically "constitutes reversible error." *Lewis*, 858 F.3d at 868 (quoting *Monroe*, 826 F.3d at 189). ALJ Hauser's written decision does not meet these minimum standards.

The overarching problem with the ALJ's written decision is that too "[m]uch of the ALJ's RFC assessment was devoted to summary" of the medical evidence and not enough to logical, accurate analysis. *Lacek v. Colvin*, Civ. Action No. CBD-13-2046, 2014 WL 2865992, at *8 (D. Md. June 23, 2014); *see also Thomas*, 916 F.3d at 311 ("[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion. The second component, the ALJ's logical explanation, is just as important as the other two."). Here, the record contains some evidence that suggests Lawrence could perform significant physical activities. For example, Lawrence engaged in power lifting for more than a year after his alleged onset of disability. On the other hand, the record also contains evidence that Lawrence stopped power lifting during the period prior to his date last insured because of his severe impairments. Furthermore, Lawrence consistently reported severe chronic pain, and some imaging and clinical findings could lend credence to his complaints. The ALJ, however, did not weigh the apparently conflicting evidence.

The Court takes no position on whether Lawrence is entitled to disability benefits before December 31, 2013. Rather, the issue "here arises from a problem that has become all too

common among [ALJ] decisions challenged in this court—a problem [agency] decision makers could avoid" if they would just "show [their] work." *Patterson*, 846 F.3d at 663 (capitalization altered); *see also Thomas*, 916 F.3d at 311–13. ALJ Hauser's written analysis in this case was so conclusory, and at points materially incomplete or contradictory, that I am "left to guess about how the ALJ arrived at [his] conclusions" on Lawrence's ability to perform work-related functions on a sustained basis. *Mascio*, 780 F.3d at 637. Thus, "because [I] cannot gauge the propriety of the ALJ's RFC assessment, [I] cannot say that substantial evidence supports the [Commissioner's] denial of benefits" for the closed period. *Patterson*, 846 F.3d at 662. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record, explain how any material inconsistencies or ambiguities were resolved at each critical stage of the disability determination process, and provide an accurate, logical description of how specific evidence in the record supports each conclusion in the RFC assessment.

## IV. Conclusion

For the foregoing reasons, the Court will **DENY** the Commissioner's motion for summary judgment, ECF No. 15, **REVERSE** the Commissioner's final decision, **REMAND** the decision for further proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket. A separate order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to the parties.

ENTER: March 31, 2019

Joel C. Hoppe
United States Magistrate Judge